| | AUSA: | Timothy Wyse | Telephone: | (313) 226-9144 |
|---|---|---|---|---|
| AO 91 (Rev. 11/11) Criminal Complaint | Special Agent: | Bryan Randall | Telephone: | (216) 701-7915 |

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

17

United States of America
v.
Bradley A. Stetkiw

Case: 2:17-mj-30566
Judge: Unassigned,
Filed: 10-25-2017 At 10:37 AM
SEALED MATTER (LH)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 2015 - June 2017 _____ in the county of _____ Oakland _____ in the _____ Eastern _____ District of _____ Michigan _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1960 | Operating an Unlicensed Money Trasmitting Business |

This criminal complaint is based on these facts:
See Attached Affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

SA Bryan Randall - HSI
_Printed name and title_

Sworn to before me and signed in my presence.

Date: 10/25/17

_Judge's signature_

City and state: _____

Hon. Mona K. Majzoub
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF MICHIGAN    )
COUNTY OF WAYNE    )    SS:
CITY OF DETROIT    )

I, Bryan V. Randall, being duly sworn, depose and states as follows:

1. I have been employed as a Special Agent with Homeland Security Investigations ("HSI"), within the United States Department of Homeland Security ("DHS") since August 2009. As a Special Agent, I am a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United Stated Code, Section 1956, et seq. and Title 18, United States Code, Section 1960, et seq. As part of my employment with HSI, I successfully completed the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the Immigration and Customs Enforcement Basic School, both of which included intensive instruction with regard to Customs laws, financial crimes and drug enforcement, including the application for, and execution of, search and arrest warrants, as well as the application for criminal complaints, and other legal process. I am currently assigned to the Dark Web Group, (hereinafter "HSI Detroit Dark Web").

1

2. During my law enforcement career, I have participated in investigations of and received information from other law enforcement officers targeting money launderers and unlicensed money transmitters who use virtual currency, specifically Bitcoin[1], to assist in the unlawful importation and distribution of contraband in the United States.

3. I have personally participated in the money laundering and unlicensed money transmitter investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, discussions with other agents of HSI and other law enforcement officials, interviews of witnesses, and my review of relevant records and reports. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by an HSI agent, law enforcement officer, or witness who had either direct or hearsay knowledge of that statement, to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among statements made by others and are stated in substance and in part unless otherwise indicated. Any interpretations or opinions rendered in this affidavit are based on my training and experience in the context of the facts of this investigation. Because this affidavit is submitted for the limited purpose of establishing probable cause for the offenses listed in the criminal complaint, it does not recite all evidence gathered thus far.

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an upper case letter B) to label the protocol, software, and community, and "bitcoin" or "bitcoins" (with a lower case b) to label units of the currency and that practice is adopted here.

2

## Overview

4. From in or about July 2015 up to and including at least in or about October 2017, the defendant, Bradley Anthony Stetkiw, ran a Bitcoin exchange in the Bloomfield Hills, Michigan, area primarily using the website "LocalBitcoins" to find customers. Operating under the user name "SaltandPepper", STETKIW bought sold and brokered deals for hundreds of thousands of dollars in bitcoins while failing to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330.

## Background of Bitcoin

5. Based on my experience in this investigation, I know the following about Bitcoin:

a. Bitcoin is a virtual currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operation on a decentralized, "peer-to-peer"[2] network. Bitcoin transactions are recorded on the "block chain." The block chain is a shared public ledger on which the entire Bitcoin network relies. All confirmed transactions are included in the block chain.

---

[2] Peer-to-peer (P2P) is a decentralized communications model in which each party has the same capabilities and either party can initiate a communication session. Unlike the client/server model, in which the client makes a service request and the server fulfills the request, the P2P network model allows each node to function as both a client and server.

3

This way, Bitcoin wallets can calculate their spendable balance and new transactions can be verified to be spending bitcoins that are actually owned by the spender. The integrity and the chronological order of the block chain are enforced with cryptography.

  b. Bitcoin mining is the process by which transactions are verified and added to the block chain, and also the means through which new bitcoins are released. Individuals who run the mining software, competing against each other to set up each new block in the chain, are known as "miners." Each new block currently releases 25 bitcoins to its miner.

  c. To acquire bitcoins without mining, a user typically purchases them from a Bitcoin exchanger. Bitcoin exchangers typically accept payments of fiat currency (currency which derives its value from government regulation or law), or other convertible virtual currencies. A user will normally send or provide payment in the form of fiat or other convertible virtual currency to an exchanger, usually via wire or ACH, for the corresponding number of bitcoins based on a floating exchange rate. The exchanger, often for a commission, will attempt to broker the purchase with another user on the exchange that is trying to sell bitcoins.

  d. In order for a user to acquire bitcoins, they must be sent to the user's Bitcoin address. This address is an alphanumeric string whose use is somewhat analogous to a bank account number. The user can then conduct transactions with other Bitcoin users, by transferring bitcoins to their Bitcoin addresses, via the Internet.

  e. Little to no personally identifiable information about the payer or payee is transmitted in a Bitcoin transaction. Only the Bitcoin addresses of the parties are needed for the transaction, which by themselves do not reveal any identifying information.

4

f.  Bitcoin is not inherently illegal and has known legitimate uses, much like cash; bitcoins, however, are also used to facilitate illicit transactions and to launder criminal proceeds, given the ease with which they can be used anonymously, again like cash.

## Background of Dark Web Marketplaces

6.  The World Wide Web is divided between the Surface Web and Deep Web. The Surface Web (also called the Visible Web, Clearnet, Indexed Web, Indexable Web) is that portion of the World Wide Web that is readily available to the general public and searchable with standard web search engines (Google, Yahoo, etc.). The Deep Web, which contains the Dark Web, is the content on the World Wide Web that is not indexed by standard search engines. The Dark Web is classified as a small portion of the Deep Web that has been intentionally hidden and is inaccessible through standard web browsers. The most famous content that resides on the Dark Web is found in the TOR network.

7.  The TOR network is an anonymous network that can only be accessed with a special web browser, called the TOR browser. TOR stands for "The Onion Router," a reference to the many layers in an onion.[3] This is the portion of the World Wide Web most widely known for illicit activities because of the anonymity associated with the TOR network. The vast majority of goods for sale on Dark Web Marketplaces consist of illegal drugs, of nearly ever variety, openly advertised on the site and prominently visible. In

---

[3] TOR directs Internet traffic through a free, worldwide, volunteer network consisting of more than six thousand relays to conceal a user's location and usage from anyone conducting network surveillance or traffic analysis. Using TOR makes it more difficult for Internet activity to be traced back to the user; this includes visits to Web sites, online posts, instant messages, and other communication forms.

5

addition to illegal drugs, Dark Web Marketplaces openly advertise child pornography, identity documents, firearms, and other contraband or regulated products. Silk Road, Silk Road 2.0, Evolution, Agora, and Nucleus are examples of current or former Dark Web Marketplaces known to law enforcement that openly market illicit goods and activities. When initially accessing Dark Web Marketplaces, a new user often needs a referral link from a known user. This referral provides some credibility to the new user. Bitcoin is the most common and widely accepted form of payment for illicit activities on Dark Web Marketplaces.

## Regulation of Bitcoin Exchangers

8. Based on my experience in this investigation, I know the following about Bitcoin exchangers:

a. Exchangers of virtual currency, including Bitcoin exchangers, are considered money transmitters under federal law and are subject to Anti-Money Laundering (AML) regulations if they conduct substantial business in the United States. See 31 C.F.R. § 1010.100 (ff)(5); see also Department of the Treasury Financial Crimes Enforcement, Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, FIN-2103-G001 (March 18, 2013).

b. Specifically, federal regulations require a virtual currency exchanger to register with the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") as a Money Services Business (MSB) and to develop and maintain an effective AML program. See 31 C.F.R. §§ 1022.210, 1022.380.

6

c.  Maintaining an effective AML program requires filing Suspicious Activity Reports with FinCEN when appropriate, including reporting substantial transactions or patterns of transactions involving the use of the MSB to facilitate criminal activity. See 31 C.F.R. § 1022.320.

d.  Maintaining an effective AML program also requires implementing effective means of verifying customer identities. See 31 C.F.R. § 1022.210 (d) (i) (A). In particular, non-bank money services businesses must, at a minimum, verify and keep a record of the identity of any customer involved in a transmission of funds of $3,000 or more. See 31 C.F.R. §§ 1010.410, 1022.400.

### LocalBitcoins.com (LBC) Website Overview

9.  Based on my experience in this investigation, I know the following about website www.localbitcoins.com (hereinafter referred to as "LBC"):

a.  LBC allows users to post advertisements where they state exchange rates and payment methods for buying or selling bitcoins. Users reply to these advertisements and agree to meet the person to buy bitcoins with cash, or trade directly with online banking. Bitcoins can be placed in LBC web wallet, where a user can pay directly for bitcoin purchases.

b.  LBC offers different types of trades:

i.  Online trades occur online entirely through LBC's trading platform without the users ever meeting their trading partner. Escrow is automatically enabled and funded for online trades, meaning that a buyer is automatically protected by LBC's escrow system.

7

  ii. Local trades are carried out face-to-face, and LBC's escrow system is not automatically enabled.

 c. LBC is based in Helsinki, Finland. LBC reports that it has users in 246 countries and 10,416 cities.

 d. LBC users have public profiles that trading partners can view. Among the information recorded on these profiles are transaction feedbacks.

### The LBC Bitcoin Exchanger Known As "SaltandPepper"

10. One high-feedback LBC user known as "SaltandPepper" began operating a Bitcoin exchange service on the site in or about January 2014, selling and buying bitcoins in exchange for United States currency. "SaltandPepper" advertised his service directly on LBC, as exemplified by the following post:

> "I am the longest, most reliable and honest trader in Oakland County. Start this trade to arrange meeting time and coin availability.
>
> Meeting only at:
>
> Tim Hortons
> 6495 Telegraph Road
> Bloomfield Twp. MI 48301
>
> The location is at Maple (15 mile) and Telegraph.
>
> Transactions not completed within 12 hours are subject to cancellation."[4]

---

[4] Unless otherwise noted, quotations from electronic communications contained herein are reproduced as they appear in the original. Errors in spelling and punctuation have not been corrected. Ellipses appearing in the original are reflected as dots without spaces ("..."), while ellipses reflecting omissions from the original are reflected as dots with spaces (". . .").

8

11.  Based on a subpoena for phone records and undercover bitcoin purchasing operations, I learned that the user of telephone number (248) 891-5609 is the defendant, Bradley A. STETKIW. During undercover operations in the past the man using cell phone number (248) 891-5609 identified himself to the UCA's as "Brad." An NLETS query resulted in obtaining a driver's license photo, full name, date of birth and full address of STETKIW. The query reported the following:

Bradley Anthony STETKIW, DOB: 01/19/1965, 740 Cortwright Street Pontiac, MI 48340.

12.  2015 Oakland County Tax records list Bradley A. STETKIW as the owner of the property located at 740 Cortwright, Pontiac, MI 48340.

13.  Early records checks show STETKIW as the registered owner of a 2005 Chrysler Pacifica (VIN 2C4GM684X5R549473) bearing Michigan plate BGF7260. The vehicle is registered to 740 Cortwright, Pontiac, MI 48340. During a more recent undercover purchase of bitcoin we learned that STETKIW has since changed the plate on the Pacifica. The new Michigan plate is DQH7879 and that plate is also registered to 740 Cortwright, Pontiac, MI 48340.

14.  Clear reports, TECS law enforcement database reports, and evaluation of Michigan driver's license records, of which a photo of Bradley Anthony STETKIW was obtained, along with the video taken from the undercover purchases of Bitcoin establish that Bradley Anthony STETKIW aka "Brad" and "SaltandPepper" are multiple names for the same individual.

9

Based on undercover transactions conducted in this investigation, I know that a typical Bitcoin purchase from STETKIW worked as follows:

a. The customer would contact STETKIW through either LBC message or via text message requesting to buy a certain amount of bitcoins.

b. STETKIW and the customer would negotiate price and STETKIW's fee/commission based off the method of payment for the bitcoin (cash, bank deposit, GreenDot MoneyPak, PayPal, etc.). STETKIW typically charged a five percent fee.

c. The customer would provide a Bitcoin address to STETKIW.

d. Upon payment, STETKIW would send bitcoins to the customer's Bitcoin address.

15. On October 23, 2017, I conducted searches for STETKIW on FinCEN's MSB Registrant Search webpage with negative results. This webpage contains entities that have registered as Money Services Businesses pursuant to the BSA regulations at 31 CFR 1022.380(a)(f). Among other requirements, individuals acting as MSBs must register with FinCEN. STETKIW has not registered as an MSB with FinCEN. 740 Cortwright Pontiac, MI returns negative results when ran through FINCEN's MSB search tool as well.

### HSI UNDERCOVER AGENT (UCA)

16. HSI UCAs, in a total of six undercover meets, purchased approximately 126.07814879 Bitcoins for $56,700(USD) from STETKIW. There were a total of 26 Bitcoin Transactions between STETKIW and the UCAs. STETKIW charged the UCAs a percentage of the total cost to sell the bitcoins to the UCA for cash and for the UCAs to

10

remain anonymous. STETKIW also brokered the deal between the UCAs an out-of-state Bitcoin seller that subsequently sold the UCA $35,000.00 worth of Bitcoin as an unlicensed money remitter. In the beginning one of the UCAs initially contacted STETKIW through LBC and subsequently corresponded primarily with STETKIW via text message. All six of the meetings took place at a Tim Horton's in Bloomfield Hills, MI. The following is a breakdown of the meetings:

    a.    August 18, 2015, purchase of 1.81331156 bitcoins for $500:

        i.    STETKIW told UCA that STETKIW normally charges 10 percent above actual bitcoin market rate to do a transaction outside of Localbitcoins.com but that he would do 9% direct to the UCA phone.

        ii.    UCA's explained that they would need more bitcoins in the future and asked STETKIW what his maximum amount would be. STETKIW stated that he could sell up to $2,500.00(USD) per person, per day. STETKIW asked the UCA's: "Were you thinking of more than that?" STETKIW then stated that he could do $2,500.00(USD) to UCA1 and $2,500(USD) to UCA2 in the same day. STETKIW, then also stated that the UCA's could bring more people and he could sell $2,500.00(USD) to each person. The UCA's asked "who regulates the $2,500.00?"

        iii.    STETKIW replied "That's a limit I've set just to make, trying to make things comfortable." The UCA's asked if they built a relationship could STETKIW help them out? STETKIW replied "There's been a lot of bullshit law enforcement stuff with people getting, Bitcoin sellers, getting arrested for money laundering." The UCA's stated, "That's not money laundering right, I'm just buying it?" STETKIW replied "They consider

11

it money laundering over a certain amount transaction." The UCA's asked how much that was. STETKIW stated "That I don't, the law varies everywhere."

    iv.    UCA's stated that they normally used Western Union. STETKIW replied that Western Union wants ID to send money, they want ID to receive money and agreed with the UCA's that the fees were extremely high.

    v.    STETKIW stated "I don't know how many people you want to bring into your circle." Then added, that was all he could do, that he didn't feel comfortable doing any more than that, but pointed out that it was per person, per day, and that the UCA's could meet him at 11:45 and do one trade and then after midnight do another trade.

    vi.    STETKIW stated, "Just, I'm just going to say this and don't tell me what you're doing with your coin because if you do, and it's something bad, then I can't sell it to you." The UCA's replied "Well your version of bad, and my version of bad are probably different." STETKIW replied "Then just don't say anything okay? That's how it goes." The UCA's replied "If you're willing to work with me, I'm willing to work with you" STETKIW replied "That's the way we have to work."

    vii.    The UCA's stated "hopefully this goes nice and smooth, and like I said, uh, I should probably know in what like, 2 weeks to get it, maybe 3 to get rid of it and then maybe like a month I'd get a hold of you." STETKIW told the UCA's that was okay, that he's around and that he has been selling for 2 years and doesn't see any quitting coming up anytime soon.

    b.    October 20, 2015, purchase of 34.92068338 bitcoins for $10,000.00:

    i.    STETKIW asked the UCA's "You think I'd draw too much attention

12

if I brought one of those bill counters in here?" The UCA's stated that they were not comfortable with having that much money being on the table; STETKIW stated "Like I said, I've been coming down here a long time and I know they don't keep, they don't keep their video more than a few days."

   ii. STETKIW stated "Let me break for a minute, the only thing I suggest to you guys, as you're riding around in the car with that kind of money, hide it, somewhere in the car, like under the spare tire or something the police aren't going to see. Because if you get pulled, let's just say you get pulled over and things get out of hand, they're going to tell you, well if you can't account for that we're seizing it. And it's legal for them to do that. Money seizure laws and stuff like that."; The UCA's asked STETKIW what he did with it and he replied "I've got a way of doing it, I'm not going to tell you how."

 c. March 22, 2016, purchase of 32.12238142 bitcoins for $13,700.00:

   i. STETKIW stated that what started him being more careful was that, a client had shown up with a Sentry Fire Safe to do a deal which was too conspicuous for STETKIW.

   ii. STETKIW asked about the UCA's receiving small bills "How do you get rid of it?" UCA2 stated "You just make small deposits over time." STETKIW stated "Well, maybe I don't want to know you get rid of it," then "cancel that question." UCA2 asked STETKIW, how do you get rid of it? STETKIW stated "Box it up." UCA2 asked about sharing ideas on how to get rid of small bills. STETKIW stated lots of stores need small bills.; UCA1 stated that he/she understood that STETKIW takes the cash and goes and buys coin but at some point the cash needs to go back into commerce and that someone wants to do something with that cash. We have that problem, we've got a lot of cash and

13

we can't go to the bank and deposit $80,000(USD) cash, I can, but I might get a phone call; STETKIW laughed and stated "Not over ten grand, I wouldn't do any transaction with a bank over ten."

    d.    April 20, 2016, purchase of 32.32635728 bitcoins for $15,000.00:

        i.    UCA explained that he/she wanted to do what they could with STETKIW but do the remainder with an out-of-state seller and pay STETKIW a percentage or whatever he was comfortable with. STETKIW stated "The problem with [the out-of-state seller] is that I've given that guy a shit ton of business and he doesn't seem to take care of my people as well as I'd like him to." The UCA asked "In what way?" STETKIW stated "He's unresponsive, an, just, his rates, I thought his rates were kind of high for uh thirty five thousand dollars." The UCA asked what the rates were and STETKIW stated "I think he said five and a half to six."

        ii.    STETKIW stated "All the business I've given him, he hasn't, he hasn't even given me a dollar worth of coin so it's kind of an annoyance factor with me too." The UCA stated "I'm not trying to cut you out of anything, I'm happy to one guy I recommended him, they trade regularly and, we're talking, it's probably way over a hundred thousand dollars by now." The UCA asked "Total?" STETKIW replied "Total, at least. And you know and he hasn't said shit. It's like, okay, well I keep sending you these people, it's probably just a courtesy to send a few dollars."

        iv.    The UCA asked how to contact the out-of-state-seller, STETKIW replied "Well I've got the info for you" and pulled out a wallet from his shirt pocket. STETKIW then provided the UCA with a piece of paper with contact information.

14

e.  August 31, 2016, purchase of 24.38074075 bitcoins for $15,000.00:

  i.  STETKIW told the UCA he would have to break up the sale into six separate transactions in order to prevent any one transaction from exceeding $2,500.00.

  ii.  STETKIW told the UCA he appreciated the fact the funds were all in $100 bills and also stated he has a money counter at his home.

  iii.  The UCA provided six wallet addressed to STETKIW who then made six different deposits for a total of 24.38084075 BTC.

f.  August 28, 2017, purchase of 0.5146744 bitcoins for $2,500.00:

  i.  STETKIW met with a UCA that he had never conducted trades with in the past. Without identifying the UCA or requesting for identification information STETKIW sold the UCA 0.5146744 bitcoins. STETKIW charged the UCA points on the transaction that equaled approximately $154.13.

### Review of STETKIW related wallet addresses

17.  Excluding the UC purchases, STETKIW is known to have sent between an estimated $82,642 and $92,250 worth of BTC to destination addresses. These transactions involved unlicensed money transmissions.

18.  At least one sent transaction was sent to a known AlphaBayMarket[5] address. On 12/24/2015, STETKIW sent .67663256 BTC worth approximately $307.76 to known AlphaBayMarket address --------------------------------PX. This particular destination address received 11 different transactions between 09/14/2015 and 02/09/2016. The purposes of these transactions are unknown.

---

[5] "AlphaBayMarket" was operated for over two years on the dark web and was used to sell deadly illegal drugs, stolen and fraudulent identification documents and access devices, counterfeit goods, malware and other computer hacking tools, firearms, and toxic chemicals throughout the world. AlphaBay was the world's largest underground marketplace of the dark net, providing an avenue for criminals to conduct business anonymously

15

## Conclusion

18. As documented by the forgoing, STETKIW has been exchanging currency for bitcoin for at least two years. Pursuant to 31 C.F.R. § 1010.100 (ff)(5) and related regulation, this activity requires STETKIW to be licensed by the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") as a Money Services Business (MSB) and to develop and maintain an effective AML program. See 31 C.F.R. §§ 1022.210, 1022.380. STETKIW is not registered as such. Furthermore, STETKIW has not verified the identity of the UCA during bitcoin transactions greater than $3,000 despite being required to do so by the relevant C.F.R. Through his words and actions, STETKIW has indicated that he is aware he is engaged in activity contrary to law. Therefore, there is probable cause to believe that STETKIW has committed the crime of Operating an Unlicensed Money Transmitting Business in violation of 18 USC § 1960.

**WHEREFORE**, based upon the foregoing probable cause and the ongoing and covert nature of the investigation, it is requested that a criminal complaint and arrest warrant issue under seal.

_____
BRYAN RANDALL
Special Agent
Homeland Security Investigations

Subscribed and sworn to before
me this 25th day of October, 2017

_____
HONORABLE MONA K. MAJZOUB
United States Magistrate Judge

16